Commonwealth of Pennsylvania, Department of Transportation, Bureau of Traffic Safety, Appellant *v.* Elroy Byrd, Appellee.

Argued September 14, 1978, before Judges CRUMLISH, JR., ROGERS and CRAIG, sitting as a panel of three.

*John L. Heaton,* Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *Robert P. Kane,* Attorney General, for appellant.

*Alexander Ogle,* with him *Ogle, Metz & Policicchio,* for appellee.

OPINION BY JUDGE CRAIG, March 2, 1979:

Can the holder of a school bus driver's license, who had previously suffered a myocardial infarction, but

who has now been found to be "fully recovered" and physically competent upon medical examination, nevertheless have his school bus operator's certificate suspended by the Bureau of Traffic Safety of the Department of Transportation solely on the basis of a departmental regulation declaring that a history of myocardial infarction alone, absolutely and without exception, disqualifies any person from legally driving a school bus?

The applicable statutory provision is Section 609 of the former Vehicle Code, entitled "Additional Examinations for School Bus Operators."[1] That section required that a school bus operator periodically pass a special test re-establishing his "fitness and competency to operate a school bus with safety" and his knowledge of relevant school bus laws and regulations. Section 609 also provided that no person could legally operate a school bus unless he:

> (3) has satisfactorily passed a physical examination to be given by the physician for the school district by which he is employed; and (4) carries a certificate issued by the examining physician at the time of examination indicating that he has passed the prescribed physical examination including an examination of the eyes. Such certificate issued by the examining physi-

---

[1] Act of April 29, 1959, P.L. 58, *formerly* 75 P.S. §609, repealed by the Act of June 17, 1976, P.L. 162.

The current Vehicle Code, 75 Pa. C.S. §101 *et seq.*, only became effective on July 1, 1977, after the commencement of the proceedings from which the Commonwealth took this appeal. Therefore, the 1959 Code still controls the resolution of this case.

75 Pa. C.S. §1509 in the current Vehicle Code states substantially the same requirements as Section 609 of the 1959 Code regarding additional physical examinations required to hold a school bus operator's license (now called a "Class 4" license, 75 Pa. C.S. §1504(d)(4)).

cian shall be valid for a period of one (1) year from the date of its issuance.

No express authorization exists under the 1959 Vehicle Code for the Department to promulgate regulations implementing Section 609 above.[2]

Here, the Department had sent appellee Byrd notice of the impending October 31, 1976 expiration of his school bus operator's certificate. Following instructions in that notice, Byrd successfully completed a competency examination, administered by the state police, and also submitted to Dr. Tenusan, a board eligible physician with a specialty in cardiology and Byrd's treating physician, a physical examination report which Dr. Tenusan completed August 16, 1976. On that report, the physician noted the occurrence of Byrd's previous myocardial infarction and added that he was presently "fully recovered" and physically qualified. The Department ordered Byrd to be recertified September 24, 1976.

In December of 1976, the department then sent Byrd a "Cardiovascular Form" which requested extensive medical data and opinions of the treating physician as to whether the patient's condition prevented "reasonable control" of a vehicle and whether any prescribed medication would render him an "un-

---

[2] In 75 Pa. C.S. §1504(c), the current Vehicle Code now grants the department express authority to promulgate regulations to establish "the qualifications necessary for the safe operation of the various types, sizes, or combinations of vehicles and the manner of examining applicants to determine their qualifications for the type or general class of license applied for."

75 Pa. C.S. §1517(a) in the current Code formally establishes a Medical Advisory Board and in 75 Pa. C.S. §1517(b) provides that "[t]he board shall formulate rules and regulations for adoption by the department on physical and mental criteria . . . relating to the licensing of drivers under the provisions of this chapter." Before the effective date of the current Vehicle Code, a Medical Board existed only informally.

safe driver." Dr. Tenusan supplied all the data and opined in the negative.

The Department then sent the completed form to a Dr. Washington with instructions to evaluate it and make recommendations. Dr. Washington returned it to the Department with a handwritten caution not to issue the license because of the past infarction. It does not appear that Dr. Washington ever personally examined Byrd.

Finally, by notice mailed December 30, 1976, the Department informed Byrd that his renewed license would be suspended under Sections 609 and 618(a)(1) of The Vehicle Code then in effect, *formerly* 75 P.S. §§609 and 618(a)(1).[3] The notice indicated that the suspension was "indefinite and until competency is established."

Upon a trial de novo, the Court of Common Pleas sustained Byrd's appeal of the suspension on the basis that, to remain valid, the Department's disqualifying regulation had to be interpreted to establish only an evidentiary "presumption" of incompetency which, as a factual matter, Byrd successfully rebutted through the credible, competent medical testimony of his treating physician, Dr. Tenusan, who testified that Byrd had fully recovered from his "mild" infarction, visited him regularly, faithfully followed his advice, and was no more of a safety risk than any other male of his age.

That decision prompted the instant appeal by the Department.

---

[3] Section 618(a)(1) provided that:

The secretary may suspend the operating privileges of any person, with or without a hearing . . . whenever the secretary finds upon sufficient evidence:

(1) that such person is incompetent to operate a motor vehicle . . . , or is afflicted with mental or physical infirmities or disabilities rendering it unsafe for such person to operate a motor vehicle . . . upon the highways.

The regulation in controversy reads as follows:

## SCHOOL BUS OPERATORS

Section 1. *Scope and Application:*

This regulation covers additional examination for school bus operators as provided for by Section 609 of The Vehicle Code. . . .

. . . .

Section 3. *General Requirements:*

. . . .

(2) A physical examination, . . . shall be given every applicant for a school bus operator certificate and shall also be given annually to all school bus operators, by the physician for the school district. *A person is physically qualified to operate a school bus if he:*

. . . .

(c) *Has no established medical history or clinical diagnosis of:*

. . . .

(2) *Myocardial infarction,* angina pectoris, coronary insufficiency or thrombosis.

(3) Cardiovascular disease, including hypertension, known to be accompanied syncope, dyspnea, collapse, or congestive cardiac failure. High blood pressure over 190mm Systolic or 110mm Diastolic shall require a waiver by the Bureau of Traffic Safety.

. . . .

(7) Any condition which in the opinion of the examining physician could interfere with his ability to safely drive a school bus.

. . . .

> (3) The examining physician shall issue a certificate to be valid for the ensuing school year, to every school bus operator who successfully completes the required physical examination and is found to be qualified in accordance with the provisions of 'The Vehicle Code' and regulations promulgated thereunder. . . . (Emphasis added.)

1 Pa. B. 290, September 26, 1970.

The Department contends that this regulation is valid and must be interpreted to result in automatic absolute disqualification of anyone who has had a prior infarction, regardless of their present individual competency.

The validity of the regulation was placed at issue by Byrd's appeal of his suspension.

We approach our review of the validity of the regulation from the perspective of the distinction in administrative law between the weight accorded an agency rule promulgated under a grant of legislative power by the legislature and the force of a rule promulgated under interpretative rule-making power. Here, because the 1959 Code did not contain any express legislative grant of rule-making power on the subject, the regulation in question stands upon an interpretative basis, as to which our Supreme Court states:

> An interpretive rule on the other hand depends for its validity not upon a *law*-making grant of power, but rather upon the willingness of a reviewing court to say that it tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute

is essentially a question of law for the court, and when convinced that the interpretive regulation adopted by an administrative agency is unwise or violative of the legislative intent, courts disregard the regulation. See, e.g., United States v. Cartwright, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed. 2d 528 (1973); Skidmore v. Swift & Co., 323 U.S. 134, 89 L.Ed. 124 (1944). (Footnote omitted.) (Emphasis in original.)

*Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 77-78, 313 A.2d 156, 169. *Recently reiterated in Girard School District v. Pittenger,* Pa. , 392 A.2d 261 (1978).

Although, the regulation in question is not free of ambiguity, the most likely meaning is the one advanced by the Department on this appeal. However, interpreted in that way, we cannot say that it reasonably "tracks the meaning of the statute" it purports to interpret.

By Section 609, the legislature clearly intended to establish extra precautions designed to insure that an individual licensed to operate a school bus would be a better safety risk than an individual licensed only to operate other kinds of vehicles.

Regarding medical qualifications, Section 609, by mandating that school bus drivers pass an annual physical and carry a certificate to that effect, contemplates an annual re-evaluation of the medical safety risk of the individual driver by a qualified examining physician. Here, Byrd established by the clear weight of the evidence precisely what the statute is designed to insure, that he currently has no medical disability that might make him less than a good safety risk.

Nevertheless, the Department's regulation would require more of Byrd than that a qualified physician examine him and find him physically sound.

Because Byrd passed all the additional requirements set forth in Section 609, including the physical examination, there is no direct violation of that statute. The only other specific suspension provision that could be applicable is Section 618(a)(1) of the Code. That section also demonstrates legislative concern for a current assessment of an individual's safety risk. The lower court pointed out the effect of that provision on the regulation in question:

> There is . . . an apparent conflict between . . . Section 618(a)(1), which authorizes suspension only if the licensee is "incompetent to operate" the vehicle or is disabled "rendering it unsafe" to operate the vehicle, and [the instant regulation] which supports a suspension by reason of a history of myocardial infarction, unless it can be said with substantial assurance that such a history proves incompetency or disability as required by the statute.

As the trial judge then commented, the only medical opinion produced here was one which definitely held that Byrd suffered from no condition "rendering it unsafe" for him to drive a bus, or, in the words of 3(2)(c)(7), of the Regulation, no condition which "could interfere with his ability to safely drive a school bus."

Of central significance is the fact that the Department offered no offsetting evidence whatsoever in support of the reasonableness or medical soundness of the regulation—no basis for the view that one infarction forever after renders a person unsafe as a school bus driver. The Commonwealth's case rested solely on documentary evidence that the infarction had been suffered by Byrd.

Accordingly, we must conclude that the regulation, as interpreted by the Commonwealth, does not conform to the expressed legislative intent of Section 618

(a)(1), the statutory basis supporting suspension for physical disability, because the regulation disqualifies without evidence of current disability.

We find the Department's regulation to be invalid and that there is no error in the lower court's finding that appellee is presently physically competent to operate a school bus.

ORDER

AND Now, this 2nd day of March, 1979, the order of the Court of Common Pleas of Somerset County, No. 4 Civil 1977, is hereby affirmed.